## No. 14,281.

INDUSTRIAL COMMISSION ET AL. *v.* STEBBINS.
(78 P. [2d] 368)

Decided March 7, 1938.   Rehearing denied April 18, 1938.

Mr. BYRON G. ROGERS, Attorney General, Mr. LOUIS SCHIFF, Assistant, Mr. HAROLD CLARK THOMPSON, for plaintiffs in error.

Messrs. SCHAETZEL, KNIGHT AND HOUSTON, for defendant in error.

*En Banc.*

MR. JUSTICE BAKKE delivered the opinion of the court.

THIS is a workmen's compensation case. Claimant was the wife of Myrtle C. Stebbins, who was injured in an automobile accident near Limon, Colorado, on December 24, 1935, and who died on December 26, 1935. The Industrial Commission found that claimant "failed to sustain the burden of proof and has failed to establish that the accident above mentioned arose either out of or in the course of decedent's employment." The district court reversed the findings of the commission and remanded the case with instructions to enter an award for the claimant. The commission, the State Compensation Insurance Fund and the employer assign error and ask for a reversal of the judgment of the district court and affirmance of the commission's award.

Stebbins was employed by Kenney as a carpenter foreman in the construction of a bridge on a highway project between Hugo and Limon, about half way between the two towns. On the mid-afternoon of December 24th, Stebbins, accompanied by claimant, was driving from Hugo to Limon, when, for some unexplained reason, he lost control of the car and the ensuing accident caused the injury which resulted in his death. The accident happened about four and one-half miles beyond the bridge and three and eight-tenths miles southeast of Limon. The crew working on the bridge had just finished pouring concrete for the floor the night before and been told by Kenney that they could lay off for a couple of days over Christmas. Claimant offered to prove that Stebbins had told her before the accident that Joe Davis, the bridge foreman, had told him, Stebbins, to go to Limon to get a man to keep fires at night under the

bridge to prevent the cement from freezing. Davis, however, testified that he instructed Stebbins: "While you are driving around be sure and pass the bridge and see if the fires and night watchman are all right." It was suggested that the purpose of Stebbins and his wife in going to Limon was to attend a drawing for an automobile that was being given away there that afternoon, but there was no evidence to support this suggestion.

A man named Bennett had been employed as night watchman to keep the fires burning, and to see that the canvas protecting them was properly spread. He arrived on duty each evening between 4:30 and 5:00 o'clock, and no one, apparently, had any reason to believe that he would not be on duty at the same time on the 24th, but because of the admitted extra precaution that Davis was taking in saving the cement, Stebbins realized that he must see Bennett and instruct him about the fires.

It is not necessary to pass upon the rejection by the commission of claimant's offer of proof, as being hearsay, because an analysis of the evidence shows the following facts to be uncontroverted: That Stebbins was employed by the month, and that he was so employed on the morning of December 24th; that he was a carpenter foreman in whom Davis had implicit confidence, and that he, Stebbins, was a faithful and conscientious employee; that on December 24th Davis had to go to Denver on business pertaining to the job, leaving Stebbins, next in authority, in charge; that the weather was cold and that Davis took every precaution against damage to the bridge which would be caused by freezing of the green cement; that Davis did give Stebbins specific instructions on that morning to the effect that "while you are driving around be sure and pass the bridge and see if the fires and night watchman are all right"; that both Davis and Stebbins knew that the night watchman lived in Limon; that in the afternoon, when Stebbins was driving around he did drive by the bridge; that he saw no one there; that he kept on to Limon, and that he was

injured on the way. In all of which he was carrying out instructions not denied.

To offset this, in seeking to avoid liability, the insurance carrier and employer sought to show that Stebbins and his wife were going to Limon for another purpose. We find no evidence thereof.

We agree with the trial court's holding that these uncontroverted facts amount in law to an establishment of *the* fact that Stebbins' injury resulted from an accident arising out of and in the course of his employment, and that the commission exceeded its jurisdiction and acted beyond its powers when it found to the contrary.

■ Ordinarily, of course, the claimant has the burden of proving his claim, but where it is admitted, as here, that the employee was at work in the course of his employment shortly preceding the time of his accident, it becomes the duty of the employer to show that the employee had left it, where employer relies on the defense that the employee was not acting in the course of his employment at the time of the injury. *Colorado Contracting Co. v. Industrial Commission,* 74 Colo. 206, 219 Pac. 1075, 66 A. L. R. 1409.

■ In reaching our conclusion herein, it is to be noted that we are not usurping the functions of the Industrial Commission as a fact-finding body. When the record evidence establishes that the employee was acting within the scope of his employment at the time of his accident—no evidence appearing to the contrary—there can properly be no finding that he was not so acting. In such circumstances the reviewing court is passing upon a question of law and not upon the facts. *Skaggs Co. v. Nixon,* 97 Colo. 314, 50 P. (2d) 55.

The judgment is affirmed.

Mr. Justice Bouck dissents.

Mr. Justice Bouck, dissenting.

The majority opinion in the case at bar overlooks and

misinterprets much of the concrete record herein. To these lapses I deem it my duty to call specific attention.

Incidentally, whenever compensation is awarded by a court after the Industrial Commission has lawfully denied it, as I think it did here, the result is not only that the insurance funds are unlawfully depleted, thus compelling higher premiums, but the sanctions and safeguards deliberately inserted by the legislature in the statute itself are palpably impaired.

In the case at bar it was the province of the Industrial Commission, and of this body alone, to find the facts and determine whether or not the accident that caused the death of claimant's husband arose out of, and happened in the course of, his employment: the only issue that under the present record could properly have been considered by the court below. The latter mistook its function when it set aside the commission's findings and ordered contrary ones to be entered by that body. "* * * We must accept the decision of the fact-finding body." *New Jersey Co. v. Patterson,* 86 Colo. 580, 586, 284 Pac. 334, 336. The fact that the commission might have found the other way, or that, if the trial court or this court were the lawful fact-finding body instead of the commission, one or the other or both courts might have decided in favor of claimant, is utterly immaterial.

It is likewise immaterial whether, if the commission had found in claimant's favor, the evidence would have been sufficient to support such a conclusion.

That the evidence was clearly sufficient to enable the commission to decide against claimant is obvious from the following verbatim testimony:

[*By the witness J. H. Davis,* Superintendent of Bridge Construction, deceased's superior; *on direct examination*]

"* * * I will ask you to state whether or not Mr. Stebbins came to the scene of the work on December 24, 1935 [the date of the fatal accident]. Yes, he did. When did he come out there? In the morning. About what

time? I don't know exactly, around eight or nine o'clock. *Was there any work for him to do that day? No.* Did you tell him whether there was, or not? *I told him there was no use for him to be there,* my whole crew took two days off. *Did you give any instructions as to getting a man* to keep up the fires? *Not to get a man but to instruct* about the fires. State what was said. *I said, 'While driving around you might pass the bridge and see the fires and if the night watchmen are all right.'* Did he state he was going to be driving around? *Yes.* What was said? *Nothing, only I presumed he would be driving around that day taking the day off.* * * * Do you know Mr. Bennett? I knew he was the night watchman. Was he working under your supervision? Yes. What were his duties? To take care of the bridge [admitted to be about half-way between Hugo and Limon] and see that it was protected. And to keep the fires up? Yes, when necessary. * * * I ask you to state whether or not the part marked 'bridge' [on an exhibit] is the bridge under which the fires were kept? Yes, that is it. And is that the bridge on which Mr. Bennett kept the fires? That is it. *Those are the fires you wanted Mr. Stebbins to look at if he was riding around that evening? Yes.* * * * *Would it be necessary to go through Limon from his home in Hugo to go to the scene of the fire? No, but from my understanding with Mr. Stebbins in talking he would be in Limon that evening. Did he give any reason why he would be in Limon? No, not that I can recall. Did you instruct him to go to Limon to see Mr. Bennett? No.* Had Mr. Bennett given you any information that he would not be back on the job on the 24th? None whatever; just a precaution is all. *Did you tell* [Stebbins] *to contact Mr. Bennett at all? No, Mr. Bennett had been working and was supposed to work that night,* but I did not want to take chances of losing green cement. *And that is why you wanted* [Stebbins] *to look at the fires? Yes, and he promised to do so.* As far as you knew, Mr. Davis, *did Mr. Stebbins have any reason for being in*

*Limon so far as any instructions given by you to him? Not as far as any from me, no.* Were you in charge of the job? Yes. *You say he told you he would be in Limon? Yes; it was more like he said he would be driving around and I said, 'While you are driving around be sure and pass the bridge and see if the fires and the night watchman are all right.'* "

The above would seem ample to serve as a fair basis for the commission's findings. However, I quote further from the evidence before the commission, as drawn out by counsel for claimant while cross-examining, as follows:

[*J. H. Davis on cross-examination*]

"According to the testimony here *he said he was going to be driving around and you asked him to stop and see that the fires and watchman were all right? Yes. And you told him you were going to leave the bridge and go home to Denver? Yes. Did you ask him to take charge of things and see that everything was all right? Nothing beyond that;* I told him to take the two days off and *all I asked was to stop and see that that watchman was there.* You were disturbed about the watchman? No, not disturbed, I was cautious. * * * And you felt confident that *Stebbins would stop by the bridge* and see that everything was all right and keep those fires going? Yes. Do you remember about March of this year, Mr. Davis, of talking to Mr. Knight [one of claimant's attorneys]? I talked to him at some time. He came to Colorado Springs to talk to you? Yes. *You signed a statement, did you not? Yes. Did you tell him at that time in words to this effect, that either the night before or the 24th Davis instructed Stebbins to stop by the bridge and see if Bennett was keeping up the fires* and stop the next morning to see if everything was O. K. and the man was there? Yes. You told him that? Yes. * * * *Did you think Bennett was supposed to be on the job to the next morning? Yes. He started his work at four or five o'clock in the afternoon* [the usual time for reporting,

according to Bennett himself, was 'about 4:30 or 5:00'];
what time did he quit? He was usually there when we
left the job and stayed until someone showed up in the
morning. * * * Had you laid everyone off? No, there
was a man to watch the fires. You said on direct ex-
amination a few minutes ago, if I understood you cor-
rectly, that you told Stebbins that the rest were laid off
and he might as well be off, too? That applied to him
and his crew but not the watchman. * * * [The certified
pay roll] shows * * * Joe Davis worked eight hours on
Tuesday; was that correct, or not? Yes. You stated
you left about noon for Denver? My *time* goes on just
the same. * * * It shows on here that M. C. Stebbins
worked eight hours on that day, Tuesday, the 24th of
December; was that correct? [The pay roll itself, intro-
duced in evidence at the suggestion of claimant's coun-
sel, shows him to be mistaken; Stebbins is *not* shown to
have worked at all on Tuesday, December 24.] *He did
not work but his time went on. He did not work the
eight hours? No.* How many of them were on the
monthly pay roll and shown as having worked on the
24th of December, and how many were on an hourly
basis? Curry, myself and Stebbins, those are the ones
*paid by the month.* * * * Stebbins had no men he was in
charge of that day.''

It was of course for the commission to believe or dis-
believe any particular testimony. We have no right to
dictate how the commission should exercise its power
of determining credibility of witnesses or weight of evi-
dence. It obviously believed Davis. That was natural
because there was no competent evidence whatever incon-
sistent with his. It would indeed be difficult if not im-
possible to discover in the record any evidence contrary
to Davis's. Certainly there was no admissible evidence
that could have justified approval if the findings of the
commission had been the other way. The above quoted
passages easily support the findings actually made. No
one would be so reckless as to say that that evidence is

*"no evidence"* or *"evidence so weak that it would amount to no evidence,"* in the language used by this court in *Industrial Commission v. Elkas,* 73 Colo. 475, 477, 216 Pac. 521, 522.

There thus being substantial evidence to support the commission's findings, courts had no lawful right to set them aside, and no court could lawfully displace the fact-finding body by substituting findings of its own, as did the trial court.

Now, as heretofore, I respectfully submit that, by calling attention to certain undeniable errors and fallacies which occur in the majority opinion, we destroy whatever plausibility this might have possessed. I quote verbatim from that opinion:

(1) "It was suggested that the purpose of Stebbins and his wife in going to Limon was to attend a drawing for an automobile that was being given away there that afternoon. But there was no evidence to support this suggestion." This is entirely immaterial in view of Davis's affirmative evidence that Stebbins had made a plan of his own to go to Limon, whatever might have been his private purpose, a matter manifestly immaterial. See also subdivision (5) below.

(2) "Because of the admitted extra precaution that Davis was taking in saving the cement, Stebbins realized that he must see Bennett and instruct him about the fires." No legal evidence can be pointed out from which an inference could be drawn that Stebbins was to see Bennett in Limon. It is purely the product of the imagination. The affirmative evidence is that Stebbins was instructed to see Bennett *at the bridge where the latter was to report at 4:30 to 5:00 p. m.,* more than one entire hour *after* the time of the accident.

(3) "Stebbins was employed by the month, and * * * was so employed on the morning of December 24th." To be accurate, the majority opinion should have said that Stebbins was *paid* by the month. It is uncontradicted that Stebbins was given a two days' holiday from

his regular employment on the evening of December 23. The pay roll in evidence credits Stebbins with eight hours' work on the 22d and the same on the 23rd, but none at all on the day of the accident. Whether the accident occurred "in the course of his employment" would therefore depend entirely upon the giving of special instructions, and the evidence all showed that none were given to the effect now claimed. If there had been some evidence to the contrary, nevertheless the commission would have had the right to decide as it did, notwithstanding any such conflict, credibility and weight being solely for its determination. One cannot say that, because an employee is paid by the year or by the month or by the week, he becomes entitled to compensation for accidents during every layoff and regardless of the fact that he is not then in the course of his employment, within the meaning of the Act.

(4) "On December 24th Davis had to go to Denver on business pertaining to the job, leaving Stebbins, next in authority, in charge." The testimony of Davis which I have quoted refutes the claim that Stebbins was "next in authority" or was left in charge. There was no evidence to support that claim. Davis simply gave his restricted instruction, which Stebbins could not have carried out by being at the place of the accident at the time it happened.

(5) "* * * He kept on to Limon * * *. In all of which he was carrying out instructions not denied." There is no evidence whatever of an instruction to go or keep on to Limon, and the claim that there was is most emphatically denied by Davis, the only one who could have given it.

(6) "To offset this, in seeking to avoid liability, the insurance carrier and employer sought to show that Stebbins and his wife were going to Limon for another purpose [than that of following an express instruction from Davis]. We find no evidence thereof." It was not incumbent upon the plaintiffs in error to prove any purpose

at all. The express instructions were clearly proved as limited to a visit at the bridge in question, to see *there* a night watchman who was not due or expected at his post until 4:30 p. m. at the earliest, so that, as already indicated, the special instructions could not possibly be complied with by a trip taken not only away from the bridge but even farther away from Stebbins' Hugo home *more than an hour before the night watchman's expected arrival at the bridge.*

(7) "We agree with the trial court's holding that these uncontroverted facts amount in law to an establishment of *the* fact that Stebbins' injury resulted from an accident arising out of and in the course of his employment, and that the commission exceeded its jurisdiction and acted beyond its powers when it found to the contrary." Inasmuch as the facts claimed as favoring the claimant were *not* "uncontroverted," but were strenuously contradicted in the testimony, the conclusion of the court is based upon a false premise.

(8) "Ordinarily, of course, the claimant has the burden of proving his claim, but where it is admitted, as here, that the employee was at work in the course of his employment shortly preceding the time of his accident, it becomes the duty of the employer to show that the employee had left it," etc. The fallacy of this statement seems to me clear on its face. The uncontradicted evidence was that a layoff had been granted from the usual course of employment for all of December 24 and 25. Citation of the case of *Colorado Contracting Co. v. Industrial Commission,* 74 Colo. 206, 219 Pac. 1075, is therefore strangely inapposite. The burden of proof is on the claimant.

(9) "It is not necessary to pass upon the rejection by the commission of claimant's offer of proof, as being hearsay, because an analysis of the evidence shows the following facts to be uncontroverted." Of course I have shown that the facts referred to were *not* uncontroverted. The analysis must have been of matters not in the pres-

ent record. The hearsay in question was the claimant's testimony as to what she alleges Stebbins told her (in the absence of Davis) as to alleged statements theretofore made to Stebbins by Davis (of course in *her* absence)! It would be interesting to know what argument could be made to justify the admission of such testimony. I submit that it was palpably inadmissible. This court should unhesitatingly have so declared. With this hearsay properly rejected, there was not a shred of evidence to have sustained a conclusion contrary to that of the commission. But, even if it had been admitted, this evidence would have presented at most a conflict which the commission—and not this court or the trial court—would have had to resolve as the only authorized fact-finding body.

For the reasons above given, the judgment of the district court should have been reversed with directions to remand the case to the Industrial Commission that the order rejecting the claim for compensation might be reinstated. Both from the affirmance of that judgment, and from the denial of the petition for rehearing, I therefore respectfully dissent.